All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. Please have a seat. Welcome to everybody here. We have a full morning of arguments before us. We've got five cases before the court this morning. Four of them are for several arguments this morning. One case has been reviewed and decided on the briefs. Before we get to our first case, there is an administrative matter we'd like to attend to. Chris, can you stand, please? Colleagues, I move for admission of Christopher P. McNutt, who is a member of the bar and he's in good standing with the highest court of California. I'm known of his credentials and I'm satisfied that he possesses the necessary qualifications. And before I pass the matter over to Judge Shaw, I'd like to say that, Chris, you know, they say that time flies when you're having fun. And I think they also say that time flies when you're working hard. And as my clerk just passed here, I think that it's the latter. Your work ethic has shown itself in different ways. You've not only earned the respect of your peers, but you've also had excellent work product. I stand confident that standing before me is one of America's future leading practitioners. It's been a pleasure working with you and I wish you the best of luck. I turn the matter now over to Judge Shaw. Judge Rayna, thank you. Many papers were filed in connection with this motion and Judge Wallach and I are all supporting. All fake news. And Judge Wallach and I have reviewed them and we are pleased to grant the motion. Congratulations. All right. Let's let's move on to our first case of this morning. Cables Inc. versus Chums Inc. Docket 16-1823. Mr. Ladra? Yes, Your Honor. And you reserve three minutes for rebuttal. Is that correct? Yes, I reserve three.  Thank you, Your Honor. The determinative issue in this case, indeed the issue that we believe requires reversal in this matter, is the question of whether there is any substantial evidence that the prior art contained, the key prior art reference, the Monroe reference, contained any reference, contained anything that discloses the critical resilient cable or member element of the claims. We contend that it's very clear that it does not and that the Board erred in concluding otherwise. Let me ask you a question. Yes, Your Honor. In the red brief at 17 and 18, the FLE says that after the Board construed the term resilient, Cables repeatedly confirmed that Monroe teaches the resilient limitation. And then they have a list. I won't go through it all, but there's five different items. Do you disagree with any of that? Yes, Your Honor, and we set it out in our brief. Indeed. What record evidence supports that? Well, I think the most, the clearest, which actually it was in the initial patent owner's response. Cite me to the appendix. Yeah, I have it here, Your Honor. Here it is. In the original patent owner's response at page 2, so we set out immediately at the beginning of this case, we say, I quote, no cited reference. Which page of the appendix is this page? This is page 2 of the patent owner's. It's actually the appendix page number is 240. Oh, okay. Thank you. It happens to be page 2 of the actual document. We say, and I quote, no cited reference teaches a resilient cable as described and claimed in the 268 patent connected to a temporary retainer. So we started out by saying there's no reference that describes it. The problem that has occurred, and we do detail this in the brief. We go through each of these. In fact, one of the instances which is detailed in the brief, I think they quote counsel as saying that there is a resilient member but not a resilient cable. Unfortunately, Monroe discloses a resilient member but not a cable appendix at 258. Exactly. And I have that highlighted. The most important point here is that nobody was confused in our position. I mean, this issue was briefed and it was discussed at the hearing. In fact, there was a long colloquy during the argument in which- Why would you argue that Monroe doesn't disclose a resilient cable? Because it doesn't, and in fact, counsel has conceded that. Monroe itself is a newspaper article, and what it does say, in fact, the only thing it says about the characteristics of the monofilament is that it is so thick and stiff that the only knot it would take would be big enough to tie up a small ship, indicating that it doesn't have the required resiliency to be able to return to its original shape. How does that indicate it? Well, because it's so stiff, we don't know, in fact, if it will even take- It ties it onto his glasses with fishing line, I think, and it hangs down behind his head, and there's nothing that says that it doesn't move up and down or flex. Okay, that's the point. There is nothing that says that. And so the question is, how do you conclude that? You're concluding that- I'm not concluding it. It's another thing to keep in mind here is that as a magnum oil, the burden always rests with the challenger. It's not our job to, in fact, prove that it doesn't have that characteristic. It's the petitioner's job to prove that it does. Well, Counselor, so Solson, I guess he's a fisherman who they interviewed in Monroe, the prior article. He says that his retainer never hangs up, never goes around his neck, so it is tied onto his glasses, right? That's not the issue here. The issue actually is the Board's construction, because what the Board says is that it has to be a resilient cable. Nobody's arguing that he didn't solve the stand-off-the-neck problem. That's not the issue here. The issue here is whether it has the second key property, and I'll explain that in a second, but the actual claim construction, the Board construes the resilient portion of resilient cable, meaning having sufficient stiffness to maintain its shape. That's not contested. And to return to its original form after being bent. Now, why is that important? That's not a trivial distinction. The Board said that for a reason. The reason is that even if it's somewhat resilient, if it doesn't return to its original shape, then over time you can see what's going to happen. It's going to basically start to droop, and it's not going to perform its function. The other problem, the concomitant point, is that, you know, if it doesn't have sufficient resiliency, one of the principal applications for this is on sunglasses. What's going to happen if you have the stick sticking out? Would an individual, a person skilled in the art, look at this and say, well, let me take a look at what 300-pound test monofilament looks like, and find that you can bend it, you let it go, and it's going to spring back to a straight line? You can't assume that. In fact, in the record, Sosen himself says and gives an example. In fact, it appears, actually it's in the... We can't assume it, but why would not a person skilled in the art look at that and just apply practical sense to... I will explain that, and it's in the record. So, Sosen also submitted a declaration. In paragraph 14 of that declaration, and this actually appears in appendix 0351. It's actually part of the hearing, but they actually quote this. So, in a sworn declaration, he says that two very famous fishermen, using the monofilament, extends rearward from the head and wearing the glasses, but in the next paragraph he says, quote, other fishermen, however, did not like the eyewear retainer sticking out behind their heads, so they rolled the monofilament line around something round, such as a pencil, to produce a coil, and then attached the coil monofilament to their glasses to create a tight-fitting retainer that gripped the back of the head. That is exactly the opposite. What he's saying there is that you take the monofilament, you wrap it around a pencil, and it'll hold its position. It'll hold its shape. You actually get a little bit of a spring, and then it'll hold tightly to the back of the head. Clearly not the invention. Now, the problem with that is that you have a lot of different, in other words, monofilament is not a monolith, so to speak. The record shows, and in fact the evidence submitted by the petitioner shows, that it can have various characteristics. What kind of monofilament was he using in the picture in the Monroe reference? What kind of properties did it have? I mean, what's amazing here is that nobody tested it. In every case that I've ever been in, an expert would come in and say, okay, here's the monofilament. Let's run it through some tests. I'll take some pictures. I'll submit it. I'll give a declaration. And I think there's a reason for that. Solson is very slippery. He goes back and forth on the characteristics of this device. And the principal legal error in this case is that the board basically, in fact, it follows this exact colloquy at the hearing. The board basically was confused. It didn't know exactly what property this had. Did it fulfill the key claim limitation that it has to return to its original shape after you bend it? And, in fact, later ---- What is its original shape after you bend it? I'm sorry. What is its original shape after you bend it? You're talking about it springs back to a straight line? If I may, Your Honor, I actually have the cable. Okay. Now, this is the invention. You brought that. I'm a fisherman, and I've seen a lot of 300- and 200-pound monofilaments. I'm looking at the practical usage or view that a procedure would have in this situation. And so am I, Your Honor. But show us there. That's not 300-pound monofilaments. No, this is the invention. I know. I know. This is just to illustrate what is meant by returning to its original shape. So if you bend it, you know, it goes back. It just goes like this. I also, you know, I said earlier that if it's too stiff, what's going to happen? It's not going to perform its function. Because if you get in the car, you know, I don't want to get into it. We can't really augment the record at this point. But if you take that 300-pound monofilament, you strap that to your glasses, and you jump in a car, and you have a headrest, you're going to knock your glasses off your face. I mean, 300-pound monofilament, I use it for shock tippet to go, you know, fish for tarpon. And, in fact, that's what the record actually reflects that. I mean, that's what he's saying. You know, you bend that, you know, around something, and it's not going to come back. It's basically going to hold its position. But the point is that the record isn't sufficient. What we're arguing is that we're looking at an obviousness situation and not anticipation. So it doesn't have to you can't take a prior reference, a 300-pound monofilament, and say, this is the only thing that you can use or that a procedure would use is 300 pounds. Why wouldn't they say, well, let me see if 200 pounds, 300 pounds works. Let me see if 200 pounds works. Well, I don't think that's the law, Your Honor. I mean, in order to find obviousness, you have to have at least some number of references that contains every element of the pattern. And here the only, absolutely the only thing, the only piece of art that was advanced for the resilient cable element of the pattern was the Monroe reference. The Monroe reference says nothing about the resiliency of it. Well, it does. It says, he says that, I don't have that article in front of me anymore, but he says something like, it stays off my neck. But staying off the neck is not the issue, Your Honor. Well, it is in the sense that it's obviously implied that if he wears this thing on a day-to-day basis and uses it, it's going to be pushed and bumped against, and it goes back to its shape. But Your Honor is indulging in speculation. I mean, this is a fisherman. He's going to be in an open boat, okay. This thing is lashed onto his glasses with dental floss. It's obvious that he does it a number of times. It's a convenience. He's going out on a fishing trip. He lashes this stuff to his glasses. He probably takes it off at the end of the day. He's not going to encounter the same kind of day-to-day use that this was intended to solve. That's the whole point, Your Honor. This is speculative. We don't know what property this has based on the record, and the board didn't know it. Well, you do have the Visser testimony. Visser? Visser did say it. Here is the sum total of Visser's declaration or his exact report. Well, you said the meaning of the word monofilament is used in the Monroe newspaper article to be a single untwisted synthetic filament as of nylon. He said based on that description, he would conclude that the monofilament is an elongated piece of resilient plastic. Right, but we don't know what its properties are. The property required by the claim is that when you bend it, it returns to its original position, plus this one statement, which, Your Honor, read, is the only thing in the record, and it runs afoul of this Court's, you know, law, which basically says that you cannot rely on a mere conclusory statement. In fact, the Magnum Oil and Tools case, which is very instructive in this matter, says that. It says, and I quote, that to satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. That's what we've got. This record is replete with conclusory statements that basically say, yeah, it's resilient, but they're ambiguous. It's resilient. So in your view, being resilient means that if you poke it or you lean behind a headrest, it will pop back up? Well, what does that mean, okay? Well, I'm asking you. I mean, that's your argument. I think Your Honor is referring to the two statements that Sosin made. There is a statement regarding that. Yeah, in the deposition. In the prior reference. Which was not the prior art. Okay. Okay. I can get to that. Okay. The one point I want to make, you know, Your Honor. You're into your rebuttal time. If you want to save it. I know, Your Honor, but this is critical. Okay. This is the issue. Okay. This is the principal issue. The Court in its here. In the colloquy at the hearing where they were going back and forth about, well, does it actually satisfy this limitation? And counsel for the Petitioner, this is Appendix 358. Okay. This is the hearing. The counsel for cables basically had explained this note, the declaration of Sosin where he's basically indicating that the monofilament does not have this property. And one of the panel members says, quote, do we have any reason to believe that it would not return to its original shape if it is just like shown in Monroe, instead of bending and tight around the pencil? Well, that shifts the burden. You know, as this Court has indicated in the Magnum Oil Tools case, that cannot be. It's not our obligation to show that the art does not have the required property. It is the Petitioner's obligation to show that it does. And that's the fundamental error. There's nothing improper about that question. Hmm? There is nothing improper about that question. I'm not saying it's an improper question. What I'm saying is it indicates it's perfectly okay. You know, show me in the record. I would like to know. Okay. Well, there is nothing in the record. But what it does show is that the Court recognizes that, hey, you know, it's uncertain whether this has the right property. You know, maybe you can help me out. That's a perfectly okay question. You say there's nothing in the record. How about the declaration that I was explaining to you? Well, the declaration is what says the opposite. There's the deposition testimony or the two snippets. Well, the deposition testimony where he says that if you bend it, it's going to pop. Right. But that doesn't say anything about whether it's the original position. Why isn't that substantial evidence? Because it's ambiguous. It requires interpretation. You can't say from that that it returns to its original shape. There is no way, shape, or form logically that you can do that. And, in fact, that's another problem with this particular case in that the doesn't explain what evidence it's relying on. Remember that the things that you're referring to, the deposition testimony and the declaration, played no part. They weren't briefed. They weren't discussed. Nothing showed up. In fact, the only time the declaration shows up is in the record where we raised it. See, the definition is having sufficient stiffness to maintain its shape and to return to its original form after being bent. Right. And then you have, I guess, this Sosen – is it Sosen? Yeah, the Sosen statement in 987, he says, It stayed off my neck. And 300-pound mono, you can't bend it or keep it down there. It will pop right back up. Isn't that sort of in line with returning to its original form after being bent? Right. But that statement goes one way, which says it can't be bent. And then in another statement, he says it can be bent, and it snaps back right to where it goes, I think, is what he says. Okay. So we'll restore you a couple of minutes of rebuttal time, okay? Okay. I appreciate it, Your Honor. Thank you. Thank you. Let's hear from the other side now. Mr. Raich? Rasech, Your Honor. Rasech. Thank you, Your Honor. It hit the nail on the head when we started off by talking about whether or not the concept of resilience was at issue in the proceedings below. The question was not raised below and was not raised or discussed until oral argument below, and therefore, according to the Fattenman Trial Practice Guide, it was waived by virtue of not being raised or briefed below. Mr. Rasech, I thought you'd say it was raised below but agreed to. Raised in the oral argument. But there are all these sites here saying they acknowledge it's resilient. Yes. So it's not a question of the issue not being raised, but apparently they're agreeing to your position. I think it's both, Your Honor. I think the reason why there wasn't extensive briefing and there wasn't extensive discussion in the board's final decision is because the question of whether or not Monroe was, in fact, a resilient cable was not raised until oral argument. It wasn't something that was an issue. It just didn't come up. And we know that that's the case because, as you say, there were many times in which there were concessions, expressed concessions about the fact that Monroe was, in fact, a resilient member. And it makes sense because the definition, as Your Honors know, it's a straightforward deposition. When it's bent, having sufficient stiffness to maintain its shape and return to its original form after being bent. So what do we know? We know that Monroe testifies or Monroe talks about the fact that it never, never touches his neck. It doesn't drape. It doesn't touch his neck. It sticks straight back off of his neck. Let me ask you. We were discussing at length with the panel was with Mr. Ladra the Monroe reference, which is, I guess, Mr. Sosin's little device. We also have the McKay reference, the Miller reference, and I guess the Chisholm reference. Do you rely for the resilience limitation on the Monroe reference or do you find it in any of those other references? A resilient cable is in the Monroe reference and in the declaration submitted in the proceedings below. There is discussion of resilience, but only in respect to the temple connector in McKay. Okay. So the concept of resilience is out there, but the concept of resilient member or cable is in Monroe and the declaration. It turns on Monroe, that aspect. Okay. So on multiple occasions, as Your Honor indicated, there are five separate times where the point was conceded in briefing below. There was some argument about loose words from lawyers, but the types of concessions are too specific and too direct, in my view, to fall into that category of loose editing. It's particularly where cables concedes that Monroe discloses a resilient member, not a cable. That's 258. And then you have on top of all of that the actual evidence submitted, which from Monroe you have Sosen bends a length of 200-pound test monofilament so thick and stiff that the only knot it would take would be big enough to tie up a small ship. To me, that's, as Your Honor was suggesting, you're bending it, and it's trying so hard to go back to its original form that you have to use a knot big enough to tie up a small ship. That suggests to a person of ordinary skill in the art resilience. In fact, that's what Mr. Visser, in his declaration, said. More or less, the express language was the definition of monofilament equals a resilient cable. Then you have the express declaration and express statements of Mr. Sosen. Mr. Sosen testifies, The monofilament 300-pound test mono, people like different things. Some people don't care if it hits their neck. Others do. I did. That's why I came up with this, to make sure it stayed off my neck. And 300-pound mono, you can't bend it or keep it down there. It will pop right back up. You bend it, it pops right back up. He's not a patent lawyer. He's not a lawyer at all. He's a fisherman. He's telling you what happens. You bend it, it pops back up. That's the definition of resilient in layman's terms. He says it again later when he's asked whether the 300-pound test monofilament maintained its shape in different weather conditions. He says, oh yeah, you can't. If you take 300-pound test mono, you can bend it and it snaps right back to where it goes. So even in adverse conditions, you bend it, it goes right back where it goes. Can you move on? Let's move on to the other issue, and that's the motivation to combine. Sure. So the motivation to combine. Motivation to combine in this case, we'll start with the motivation to combine Monroe and McKay. And our view, and as argued and presented evidence down below, three reasons. Simple substitution. These are the broad categories. Simple substitution of one element in the prior art for another. Application of a known technique or piece of prior art ready for improvement. And ultimately, a predictable use of elements in prior art according to their established functions. So what's the evidence? Visser testifies that one unskilled in the art would be motivated to combine Monroe and McKay because you want to replace the connection method of Monroe, which everyone understands is cumbersome, tying fishing lines and knots and then heating it up, with the established temple connector of McKay, the rubber connector, which because it's simpler, would allow, as he testifies, the connectors would allow users to easily attach the eyewear retainer to glasses without having to heat the monofilament and finish with a knot. In other words, it's user-friendly. If I take Monroe and instead of making them wrap it up with fishing wire and tie a knot and heat it every time they want to put it on or off their glasses, I use what exists, the McKay temple connectors, and use known methods to connect the connectors to the elongate member, I have a user-friendly off-the-neck retainer. How would that be off-the-neck? Because the McKay reference, looking at the pictures, 420, 421 of the joint appendix seems to hang down in the back. McKay teaches a filament, a cord basically, that's not a monofilament, not the 300-pound test. You substitute what was draping on the neck for a material that doesn't drape on the neck, that's resilient and extends straight backwards from the neck. A Monroe type. The McKay connectors. You're using the McKay connectors. With a Monroe type monofilament. Yeah. I should have made that more clear. Starting with Monroe, you already have an off-the-neck retainer, but what you don't have is user-friendly temple connectors. So you substitute McKay's temple connectors for the temple connection of Monroe, and you have an off-the-neck retainer with rubber connectors. I'm concerned whether the Board actually made explicit findings or provided an explicit reason to combine the references. It appears to me that perhaps they shifted that burden over to cables. Your Honor, I don't believe they did. I think I can help you with that. I think there are three express places where I believe the Board identified its reasoning for the motivation to combine and then a whole list of them, which I would call incorporation by reference. So in terms of the express motivations to combine, the Board below indicated that a person of ordinary skill in the art would know and understand that it would be a matter of simple substitution to switch materials commonly used in eyewear, in the field of eyewear, and that's specifically, they state, Miller specifically. Where's your site? It's Appendix 17. Miller specifically discusses that in the field of eyewear, it is well known to use a variety of materials including, for example, coaxial cable to encircle a wearer's head. They go on and later say that Sosin already figured out the problem. So solving a known problem is another common motivation to combine. But the Board indicates properly that, in fact, Sosin had already figured it out. They state at Appendix pages 21 and 22, we are persuaded that Mr. Sosin's device disclosed in the Monroe reference solved the being-in-the-way problem. Mr. Sosin stated, I don't like light line that falls on my neck in the heat. In his development, the retainer never hangs up and never drapes around his neck. Indeed, it sticks straight up behind his head at all times. The glasses are worn. Later, the Board says, given the concept of off-the-neck retainer was known in the prior art, it is not definitive which preferences the petitioner looked at in designing its own product. That's at 29. Still elsewhere, the Board confirms the evidence that Chums and Crokeys presented that, in fact, we're talking about a simple mechanical device and a simple substitution of materials. This is what the Board said in the context of challenges to Mr. Visser's statements that it was, in fact, a simple mechanical device and simple substitution. The Board states at pages 24 and 25 of the appendix, patent owner takes issue with Mr. Visser's statements that the invention is simple and that only simple substitution is required. We are not persuaded that Visser's declaration is insufficient and vague based on the patent owner's assertions alone. I had a problem with those statements because if you look at Monroe and see what he had done, I mean, in order to keep 300-pound monofilament on his glasses, he had to wrap elastic dental floss. Even if you look at the picture, you can see. It's a lot of stuff. And 300-pound monofilament is very difficult to use. I mean, we even have the evidence in the record that if you tie a knot with it, it'll hold a small ship. Okay. Right? So for the Board to say this is simple, just use one of these retainers. But really, do those retainers, does the Board explain how those retainers would keep 300-pound monofilament in place? Or did it leave it up to Cable to make that argument in the negative? It did not. And the next section I was going to, Your Honor, explains where the Board went with that particular question. It goes on to talk about Mr. McMurrin's testimony. Second. And this is at 26 and 27 in the appendix. And Mr. McMurrin's testimony, in essence, is this is how we've always done it at Cables since 2002, meaning we take nylon cord and use a bonding agent to bond the rubber connectors to my elongate member. And what he goes on to say is all I did in this case was take the same bonding agent and a cable, a coded cable, put the same bonding agent on it, did the same process that I always did, and it worked. And in looking at that testimony, the Board said, the evidence illustrates that the petitioner only required minimal experimentation and one set of trials by Sterling McMurrin, a TRUMS employee, to achieve an off-the-neck retainer. And that side is at 321 to 322. That might be wrong, but it's citing to his statements at 879 to 881 in the appendix. Petitioner demonstrates that it could be done and, in fact, was done with minimal effort, undermines patent owner's argument that it was somehow more than a simple substitution. So they went further. They looked at the evidence of what actually happened. And it was, in fact, a simple substitution. And that's what Mr. McMurrin concluded. And, again, that's at 26 and 27 of the appendix. Beyond all of the express motivations, it's also possible to read incorporation by reference to arguments that TRUMS made in its petition, TRUMS and Croakeys. You can find that, too, at pages 16 and 17 of the appendix, where the board says, we are persuaded by petitioner's claim charts and arguments that the combination of references teaches temporal retainers connected by a resilient cable or member. It goes on to cite pages 35 through 37 and 46 through 48 of the petition. And in those pages, supported by the declaration of Mr. Visser and Mr. McMurrin, TRUMS and Croakeys argue that a person of ordinary skill in the art would be motivated to combine, as we've been discussing, Monroe and McKay, because, ultimately, one, it's more user-friendly if you use a rubber connector at the end instead of the floss that Your Honor was talking about. Two, it's more versatile because McKay discloses different places along the glasses where you can connect. And three, as we just discussed, the methodology is well-known in the industry. It also, in those pages, talks about the connection or the motivation to combine Chisholm and Monroe. Monroe, of course, in that case, you already have the rubber connectors, and what you're doing is trying to solve the off-the-neck problem, and, again, relying on the declaration of Visser in that context. The problem is solved by Sosen. A person of ordinary skill in the art would know that it was solved and would find it a simple matter of substitution. Thank you, Your Honor. Okay, thank you. Mr. Lederer, I'll restore two minutes of rebuttal time. Okay, thank you very much, Your Honor. Okay, with respect to, again, the notion of, I guess for lack of a better term, waiver, the bottom line is that this was argued at the hearing, there were exchanges on it. Was it briefed? Well, yes, it was briefed in the sense that all of the evidence that was discussed at the hearing was. No, did you brief the argument? We briefed the argument, certainly. The resident's argument? Absolutely. In this court, we did. No, where in the record is the briefing of the argument? The record is below. Oh, I'm sorry. Well, the particular colloquy concerning this. Not an oral argument. Was it briefed prior, and where is it in the record? Okay, I want to make sure I'm answering the question accurately. So when you say what was specifically briefed, in other words, was the argument that the Was the resilient's argument briefed in court? Well, I cited the one section where in the petitioner's response, we say that there's nothing in the record that shows the resilient cable, you know, as claimed in the patent. There are at least two references. One is in our brief, and the other one is the one I just read you. You want me to redo it? So the concern here, Counselor, is whether this argument that you're raising before us, and obviously you briefed it here before us, but did you raise it below? Yes, I told you there are two instances. In the patent owner's response. Okay, first we do cite one instance. Where's the patent owner's response again? I remember you referred to it earlier, but I... Was it three? Okay. It's the appendix, page 240. 0240. I'll read it again. It says, no cited reference teaches the resilient cable was described and claimed in the 268 patent. Is this 0240? Yes, 0240. I don't have a 0240. Neither do I. Okay, I'm sorry. I didn't bring the entire appendix. No, no, but we have the entire appendix. Right. Okay, it's page 2 of the patent owner's response, and I just read it. I mean, the problem actually was because at the hearing, and in fact most of the discussion surrounding this revolved around the notion of a cable. There was this debate in the claim construction about whether it was a cable or whether it was something else. Could it be a resilient member? Claims obviously use both member and cable, but they only talk about in the specification the issue of cable. The reason for a cable, and the reason nobody uses monofilament in any of these devices, is that a twisted wire cable actually has the proper qualities of being able to be deformed and come back to its original form and also hold its stiffness and not bounce the glasses off your head if you jump in and hit your retainer on a headrest. And so it wasn't, clearly, Your Honor, it wasn't a major focus. And in fact, that's why none of the evidence that the petitions rely on to show that it was resilient in the manner required by the claims also came in after the hearing. I mean, none of this, none of the Soson deposition and until the declaration about it. Well, there's two ways to look at that. Right, I know. It wasn't raised. Yes. Well, it was raised in the sense that a major portion of the discussion at the hearing, you know, was on precisely this point. Are you being up to this counsel? I'm not trying to be, Your Honor. I don't exactly understand your question. It wasn't raised before oral argument. No. Well, it wasn't raised before oral argument, although I will say that based on the petition owner's response, patent owner's response, it was in fact, we didn't concede the point, but you're right, it wasn't raised. There's a distinction between conceding the point, which I think clearly the evidence shows that we didn't, and having it as a major feature of the argument in the briefing. Your Honor is correct. The briefing doesn't discuss this issue. It clearly was discussed at the hearing, and it wasn't waived because we said we don't concede that the prior art contains this limitation. I guess that's the fair way to view it. I'm looking at 258, which I guess is the patent owner's response. Monroe discloses a resilient member, but not a cable. Right, and that's what I was trying to explain. So you're saying there Monroe's resilient, but we don't have the cable feature. An important concept here is that resilience. Is that what the argument was? Yes. In fact, I mentioned that earlier. In other words, we do say the lawyer there was, I said there was a lot of discussion in the briefing surrounding, in the claim construction briefing about a cable. That was the bulk of the argument below. Exactly, because. The word resilience came up in that context, but you did not make the argument that you're presenting today. You did not present it to the board, well, the argument, but you didn't brief it. We didn't brief it, and it only came up when the board actually. And that's the question we were asking you, counsel, whether you had briefed it or not. No, I've said that. We did not brief it. We didn't concede the point, but we certainly argued it at the hearing. Those are the three points. Okay. Do you want to conclude? I will conclude by saying that the difficulty in this case is that the evidence, I think, is ambiguous. You cannot basically say that the evidence clearly shows that the Monroe reference, which is the only one that's offered for the resilient, for the incidental cable. Counsel conceded at the hearing. In fact, when asked, the petitioner's counsel said, I don't think Monroe itself describes the ability to return to a particular position. Okay. Okay. We have your argument. Thank you.